UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DARROLL C. TRINKLE

    Plaintiff,

v.

                              Case No. 16-14361

HAMMER TRUCKING, INC. and
ROBERT NIETHAMMER,       HON. DENISE PAGE HOOD

    Defendants.
_____/

## ORDER DENYING DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT [#24]

**I.    INTRODUCTION**

Plaintiff worked as a truck driver for Defendant Hammer Trucking, Inc. ("Hammer") from August 2000 until approximately July 31, 2013. On December 15, 2016, Plaintiff sued Defendants for alleged interference with, and retaliation for, the exercise of his ERISA rights, in violation of 29 U.S.C. § 1140. On February 5, 2018, Defendants filed a Motion for Summary Judgment. [Dkt. No. 24] The Motion has been fully briefed, and a hearing on the Motion for Summary Judgment was held on April 11, 2018. For the reasons that follow, the Court denies Defendants' Motion for Summary Judgment.

## II. BACKGROUND

Plaintiff began working for Hammer in August 2000, and he held a valid commercial driver's license ("CDL"), which is required under State of Michigan law to drive commercial trucks. Plaintiff was a participant in the "Hammer Trucking, Inc. 401(k) Profit Sharing Plan" ("Plan"), an employee pension benefit plan within the meaning of ERISA In 2004, Plaintiff was diagnosed with diabetes mellitus, type 2. At that time, Plaintiff was prescribed an oral medication and his diabetes did not affect his ability to maintain his CDL or drive trucks for Hammer. According to Plaintiff's physician, John O'Brien, MD ("Dr. O'Brien"), by March 2010, Plaintiff had become insulin dependent, Dkt. No. 24, Ex. 5 at 11-12, but Plaintiff never notified Defendants that he had become insulin dependent. Dkt. No. 24, Ex. 3 at 16-17; Ex. 2 at 71.

Plaintiff passed his physical and was able to renew his CDL in November 2011, even though he was insulin dependent. Under Michigan law, a person who is insulin dependent cannot receive a CDL unless he or she obtained a waiver from the State of Michigan after jointly – with his or her employer – an application for such a waiver. *See* M.C.L. 480.12(d), 480.12(2). Plaintiff never asked Hammer, and never on his own attempted, to apply for a waiver. According to Dr. O'Brien, Plaintiff's diabetes was uncontrolled after 2010, even with the prescribed insulin. Dkt. No. 24, Ex. 5 at 15, 28-29, 37-41; Ex. 3 at 56-57.

In December 2012 or January 2013, Plaintiff had to have the big toe on his right foot amputated due to diabetes complications. He returned to driving for Hammer after that surgery. In early July 2013, Plaintiff notified Gwendolyn Niethammer, who handled Hammer's benefits, that he was having another surgery and had the second toe on his right foot amputated on or about July 5, 2013. During the period between those amputations, Plaintiff began to consider applying for Social Security Disability benefits, and he first spoke to Dr. O'Brien about applying for Social Security Disability benefits in January 2013. Dkt. No. 24, Ex. 5 at 17.

Plaintiff states that, in July 2013, due to the costs of his illness and hospitalization, he sought to withdraw funds from his Plan account and asked Hammer/Gwen Niethammer for permission to do so. He claims that, as he had done before, he asked to borrow money from his Plan account but Gwen Niethammer denied his request. Gwen Niethammer denies that any such conversation took place. Dkt. No. 24, Ex. 2 at 49-52. On July 26, 2013, Dr. O'Brien completed a Medical Statement for Social Security Disability Claim ("SSD Claim") for Plaintiff, declaring Plaintiff disabled from driving a truck and describing Plaintiff's symptoms as "pain & tingling in feet on insulin therapy – no longer able to possess CDL." Dkt. No. 27, Ex. 6; Dkt. No. 24, Ex. 9. Plaintiff's claim for Social Security Disability benefits was received by the Social Security Administration on July 29, 2013 at 10:27 a.m. Dkt.

3

No. 24, Ex. 10; Ex. 11; Ex. 5 at 21-27; Ex. 4; Ex. 10 at 13-15.

Plaintiff states that he called the Plan Administrator and spoke to Paul Stephens (the call seemingly occurred on July 29, 30, or 31, 2013 and, for purposes of this Order shall be treated as having occurred on July 29, 2013). Plaintiff indicates that he told Paul Stephens that he (Plaintiff) needed $10,000 and that Hammer was not helping Plaintiff get money from his Plan account. Paul Stephens reportedly stated that Plaintiff could do an "emergency medical withdrawal," Dkt. No. 27, Ex. 2 at 33, and Plaintiff asked Paul Stephens to get him a $10,000 loan from Plaintiff's Plan account. *Id.* In an affidavit, Paul Stephens denies having such a conversation with Plaintiff at that time. Dkt. No. 29, Ex. 1.

On July 29, 2013, approximately 2 hours after Plaintiff's Social Security claim was filed, Patricia Dickerson, Director of Administration for Pension Plan Services, Inc. ("Plan Administrator") received via facsimile an Election of Direct Rollover for Qualifying Distribution ("Distribution Election") filled out in Plaintiff's handwriting that requested distribution of his entire Plan account. On the Distribution Election, Plaintiff gave July 30, 2013 as his date of termination. Dkt. No. 24, Ex. 1; Ex. 4; Ex. 3 at 42. The receipt of a Distribution Election directly from a Plan participant was unusual, since normally the employer (Hammer) would communicate with Ms. Dickerson about any proposed loans from the Plan or distributions of an entire

4

account, so she contacted Defendants. Dkt. No. 24, Ex 1. Defendants were unaware of Plaintiff's intent to terminate his employment or withdraw his entire Plan account and still understood Plaintiff to be temporarily off work after having surgery. Dkt. No. 24, Ex. 2 at 45, 80-81.

Plaintiff states that, on the same day he spoke to Paul Stephens, Robert Niethammer called Plaintiff, scolded Plaintiff for attempting to withdraw funds from the Plan account, discharged Plaintiff from his employment at Hammer, and canceled all Plaintiff's fringe benefits. *Id*. at 21, 47; Dkt. No. 27, Ex. 3 at 144.[1] On that same day (July 29, 2013), Plaintiff elected to receive a distribution of his entire Plan account, Dkt. No. 27, Ex. 4; Ex. 5, Ex. 10. The Plan Administrator processed Plaintiff's request to withdraw his entire Plan account, and within a couple weeks Plaintiff was given all of the funds in his Plan account, less the sums Plaintiff had directed to be paid for state and federal taxes and penalties, and Plaintiff's last day of employment for Hammer was July 31, 2013. Dkt. No. 24, Ex.1; Ex. 3 at 65-66, 68-70.

---

[1]Defendants claim that on July 29, 2013, Robert Niethammer called Plaintiff after hearing from Ms. Dickerson. Defendants state that Plaintiff told Robert Niethammer that, because of the medicine Plaintiff was taking, his doctor would not let him drive commercial trucks anymore. Robert Niethammer told Plaintiff that since the job required driving commercial trucks, Plaintiff was "done." Dkt. No. 24, Ex. 7 at 35, 49; Ex. 11 at 30. In considering Defendant's Motion for Summary Judgment, the Court must accept Plaintiff's version as accurate and Defendants' version can be presented to the fact finder.

Plaintiff has not been gainfully employed since he left Hammer, Dkt. No. 24, Ex. 3 at 52-54, and stated at his deposition,

> Q: Okay, Did you try to get another driver job?
>
> A: No. I was done driving.
>
> Q: Because you were not physically able, correct?
>
> A: Correct. No, I just didn't want to go down the road with a missile, the truck, a missile.
>
> Q: Right.
>
> A: The trucks weighed 159,000, and if I had a blackout, took too much insulin, and my sugar went high, and I blackout, and I –I don't want to kill nobody, that's why I got off the road.

Dkt. No. 24, Ex. 3 at 53-54.

In November 2013, the Social Security Administration declared Plaintiff eligible for disability benefits as of January 1, 2014, because by then he would have been disabled for five full months. Dkt. No. 24, Ex. 11. Plaintiff continues to receive Social Security Disability benefits. As Dr. O'Brien testified, given the state of medicine from 2010 to the present, there is no reasonable medical likelihood that Plaintiff's medical condition will ever improve to the point that Plaintiff could stop taking insulin. Dkt. No. 24, Ex. 5 at 28-30; Ex. 3 at 28.

### III. APPLICABLE LAW & ANALYSIS

**A. Rule 56**

Summary judgment is appropriate in cases where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the burden of demonstrating that summary judgment is appropriate. *Equal Employment Opportunity Comm'n v. MacMillan Bloedel Containers, Inc.*, 503 F.2d 1086, 1093 (6th Cir. 1974). The Court must consider the admissible evidence in the light most favorable to the nonmoving party. *Sagan v. United States of Am.*, 342 F.3d 493, 497 (6th Cir. 2003).

"At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (emphasis added). To create a genuine issue of material fact, the nonmovant must do more than present "some evidence" of a disputed fact. Any dispute as to a material fact must be established by affidavits or other documentary evidence. Fed. R. Civ. P. 56(c). "If the [nonmovant's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 249-50 (citations omitted). Accordingly, a nonmovant "must produce evidence that would be sufficient to require

submission to the jury of the dispute over the fact." *Mathieu v. Chun*, 828 F. Supp. 495, 497 (E.D. Mich. 1993) (citations omitted). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott*, 550 U.S. at 380.

**B.     Analysis**

Plaintiff claims that when Hammer (Gwen Niethammer) denied his request to withdraw funds from his Plan account, Hammer interfered with his rights under ERISA. Plaintiff also claims that when Hammer (Robert Niethammer) terminated Plaintiff, it did so in retaliation for his attempt to exercise his rights under ERISA.

Defendants deny that Plaintiff ever spoke to Gwen Niethammer about making a withdrawal from his Plan account in July 2013 – or that anyone at Hammer refused any such request. Defendants argue that they did not interfere with Plaintiff's ERISA rights, fire him, or retaliate against him in any way. Defendants argue that Plaintiff chose to leave his employment and apply for Social Security Disability benefits because, as an insulin dependent diabetic, he was unable to hold a CDL, which was a legal requirement to perform as a commercial truck driver – the job he held with Hammer. Defendants contend that those circumstances would have forced him to quit his job at Hammer no matter what. Defendants assert that Plaintiff has offered no

8

evidence that shows any Defendant had the specific intent to interfere with his rights under ERISA or to retaliate against Plaintiff for the exercise – or attempted exercise – of those rights.

"'It shall be unlawful for any person to discharge . . . a participant or beneficiary . . . for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan[.]'" *Humphreys v. Bellaire Corp.*, 966 F.2d 1037, 1043 (6th Cir. 1992) (quoting 29 U.S.C. § 1140). A plaintiff must show that a defendant acted with the intent of interfering with his ERISA rights, or that the defendant retaliated against the plaintiff for exercising or attempting to exercise his ERISA rights, in order to prevail on a Section 1140 retaliation claim. *Smith v. Ameritech*, 129 F.3d 857, 865 (6th Cir. 1997); *Humphreys*, 966 F.2d at 1043.

If there is no direct evidence of employer motivation, the court will apply the *McDonnell-Douglas/Burdine* burden-shifting approach. First, a "plaintiff must show the existence of a genuine issue of material fact that there was: '(1) prohibited employer conduct (2) taken for the purpose of interfering (3) with the attainment of any right to which the employee may become entitled.'" *Humphreys*, 966 F.2d at 1043 (quoting *Gavelik v. Continental Can Co.*, 812 F.2d 834, 852 (3d Cir. 1987)). *See also Ensley v. Ford Motor Co.*, F. App'x 658, 660 (6th Cir. 2010); *Crawford*, 560 F.3d 607, 613; *Smith*, 129 F.3d at 865. "The plaintiff is not required to show that the

employer's sole purpose in discharging him was to interfere with his pension benefits, but rather that it was 'a motivating factor' in the decision." *Humphreys*, 966 F.2d at 1037 (quoting *Meredith v. Navistar Int'l Transport. Corp.*, 935 F.2d 124, 127 (7th Cir. 1991) and citing *Conkwright v. Westinghouse Elec. Corp.*, 933 F.2d 231, 238 (4th Cir. 1991)).

If the plaintiff establishes a *prima facie* case, "the employer must produce evidence supporting a legitimate, non-discriminatory reason for the discharge." *Crawford v. TRW Auto US, LLC*, 560 F.3d 607, 613-14 (6th Cir. 2009); *Humphreys*, 966 F.2d at 1043. "If the employer successfully asserts a legitimate reason for its actions, then the presumption of wrongful action drops from the case, and the plaintiff must either prove that the interference with pension benefits was a motivating factor in the employer's actions or prove that the employer's proffered reason is unworthy of credence." *Humphreys*, 966 F.2d at 1043. "[A] plaintiff must show 'a causal link between pension benefits and the adverse employment decision.'" *Smith*, 129 F.3d at 865 (quoting *Humphreys*, 966 F.2d at 1044).

Plaintiff argues that he has produced direct evidence that Defendants retaliated against him with unlawful intent. Plaintiff cites to the conversation he had with Robert Niethammer on or about July 29, 2013, when Robert Niethammer "called him, scolded him for attempting to withdraw funds from [Plaintiff's] Plan account, and

discharged Plaintiff . . . from his employment with" Hammer.

Plaintiff also contends that he has shown sufficient circumstantial evidence to establish a *prima facie* case that Defendants interfered with the exercise of Plaintiff's rights, but he does not specify what that evidence is. He asserts that he has shown that Defendants were motivated to interfere, though his support seems to be no more than stating that Plaintiff "has shown a strong and direct connection between Defendants' perception of him exercising his ERISA rights and Defendants' action," together with the proximity of Defendants expressing their intent and taking action.

Plaintiff argues that the "violating" telephone conversation with Defendants happened before Plaintiff faxed his Distribution Election on July 29, 2013, and Defendants terminating Plaintiff on July 30, 2013. Plaintiff claims that the key telephone conversation happened before July 26, 2013, and that the fact that Plaintiff considered applying for Social Security Disability benefits before then does not matter because he did not apply for such benefits until July 29, 2013. Plaintiff states that the distribution by Hammer of the entirety of his Plan account does not foreclose his claims, nor did his application for Social Security Disability benefits because those benefits were not approved until November 1, 2013, and he did not start to receive any benefits until January 1, 2014.

Defendants argue that numerous undisputed facts support granting their motion

11

for summary judgment: (1) Plaintiff was ineligible for a partial distribution of his Plan account; (2) Plaintiff could borrow – and had twice borrowed – funds from his Plan account; (3) truck drivers who worked for Hammer were required by law to hold a valid CDL; (4) Plaintiff began to suffer from diabetes mellitus, type 2, in 2004 and was insulin dependent from 2010 forward; (5) Plaintiff's diabetes condition, including the insulin requirement, meant that he could only qualify to drive a commercial motor vehicle if he obtained a waiver from the State of Michigan after application by Plaintiff and Hammer (his employer) – and Plaintiff knew that; (6) Plaintiff never applied for or obtained a waiver; (7) Plaintiff did not advise Hammer that he had a clinical diagnosis of diabetes mellitus requiring insulin for control; (8) Plaintiff had toes amputated in January 2013 and July 2013; (8) Dr. O'Brien completed a SSD Claim form for Plaintiff on July 26, 2013, indicating that Plaintiff had "pain & tingling in feet on insulin therapy – no longer able to possess CDL"; (9) on July 29, 2013, Plaintiff's Benefit Application was received by the Social Security Administration at 10:27 a.m. and Plaintiff requested distribution of his entire Plan account at 12:27 p.m., giving his date of termination as July 30, 2013; and (10) Plaintiff's entire Plan account was distributed to him.

Defendants argue that the undisputed facts demonstrate that: (1) Plaintiff left his employment with Hammer at the end of July 2013 because his health had

12

deteriorated to the point that he was disabled from legally continuing to retain a CDL and work as a commercial truck driver for Hammer; and (2) even if Plaintiff had asked to borrow from his Plan account, his health – together with the legal and physical requirements of commercial truck driving – would have forced him to quit his job at the end of July 2013, as he was disabled, which the Social Security Administration later determined.

Defendants assert that Plaintiff has submitted no evidence that Defendants had the specific intent to interfere with his rights under ERISA or to retaliate against him for his exercise or attempted of his rights under ERISA. Defendant contends that the undisputed evidence shows that Plaintiff had decided to apply for Social Security Disability benefits, leave his employment with Hammer, and stop driving commercial trucks by the time he even asked Hammer for any distribution of his Plan account at the end of July 2013.

The Court denies Defendants' Motion for Summary Judgment. There is evidence – although it is only Plaintiff's testimony – that Plaintiff contacted Gwen Niethammer about obtaining a withdrawal or loan from his Plan account and such request was denied. There is evidence – again, it is only Plaintiff's testimony – that Robert Niethammer called Plaintiff and terminated him because Plaintiff had requested withdrawals from his Plan account. The fact that Plaintiff was ineligible to

13

work because he could not qualify for a CDL as insulin dependent (without a waiver) does not vitiate his claims because Defendants did not know that he was ineligible to drive when they (allegedly) denied his withdrawal/loan and terminated him for attempting to exercise his ERISA rights. Accepting Plaintiff's testimony as true, there is evidence that Defendants had the intent to interfere with Plaintiff's ERISA rights and retaliated against Plaintiff for attempting to exercise such rights.

Although Defendants' arguments are compelling – including the fact that Plaintiff was ineligible to perform the job Hammer employed him to perform, their arguments ignore Plaintiff's testimony and the genuine dispute of material fact that Plaintiff's testimony creates.

## IV. CONCLUSION

Accordingly,

IT IS ORDERED that Defendants' Motion for Summary Judgment [Dkt. No. 24] is **DENIED**.

IT IS ORDERED.

S/Denise Page Hood
Chief Judge, United States District Court

Dated: May 15, 2018

I hereby certify that a copy of the foregoing document was served upon counsel of record on May 15, 2018, by electronic and/or ordinary mail.

                                       S/LaShawn R. Saulsberry
                                       Case Manager